STATE of Utah, Plaintiff and
Respondent,

v.

Marvin WHITTENBACK and John
Joseph Parrett, Defendants and
Appellants.

Nos. 16575, 16738.

Supreme Court of Utah.

Oct. 30, 1980.

Robert J. Schumacher and Lynn C. Harris of Utah County Legal Defender Ass'n, Provo, for defendants and appellants.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Justice:

This is an appeal from convictions of theft[1] by co–defendants Whittenback and Parrett.

Pursuant to police department directives, on March 26, 1979, at approximately 1:00 a. m., Officer Craig Geslison was patrolling an area of Provo, Utah, where several thefts from businesses had recently been reported. He noticed defendants within an all–night laundromat and recognized them from a

previous encounter.[2] Geslison called for assistance, entered the laundromat, asked defendants for their identification, and inquired as to what they were doing there. Defendants answered that they were merely doing their laundry. Parrett explained that they lived in Salt Lake City and were in Provo for the purpose of visiting his ex–wife, whose address he did not know. Geslison asked who owned the automobile parked in front of the laundromat, and Parrett said it was his. The officer requested permission to search the automobile and Parrett responded in the affirmative. Two other officers (Mock and Leatham) arrived about that time and were instructed by Geslison to search the automobile.

While the other officers searched the automobile, and pursuant to his observation of "bulges" in defendants' pockets and two lock picks on the floor under Whittenback's seat, Geslison asked the pair to empty their pockets. Parrett complied immediately. Whittenback questioned Geslison's authority, and then apparently started to empty his pockets. As Whittenback was emptying his pockets, Officer Mock entered the laundromat, having completed the search of the automobile, and placed both defendants under arrest for possession of burglary tools.[3]

Among the contents of Whittenback's pockets was a large number of quarters and dimes, the coins required to operate the laundry machines. Parrett's pockets contained a key of the type used to open washing machines. The automobile contained two "Valley Bank" bags containing a large number of quarters and dimes, several machine keys, a lock pick with instructions and a pair of needle–nose pliers. Also found in the automobile were several machine keys, a white sock full of dimes, and a screwdri-

1. In violation of U.C.A., 1953, 76–6–404 and 412.

2. On July 28, 1978, Officer Geslison had responded to a request that he investigate "suspicious persons" at a Provo apartment house. On so investigating, Geslison encountered defendants. Although no arrest was made, marijuana and a bag of coins were allegedly discovered in defendants' vehicle.

3. There is some question as to whether the arrest occurred before or after Whittenback emptied his pockets. From the record, it appears that Whittenback had at least started to empty his pockets when Mock came in and arrested the defendants.

ver with an altered head. A total of approximately $596 in coins was found either on defendants' persons or in the automobile.

Immediately following the arrest, the police notified the owner of the laundromat, William Oldroyd, of the suspected theft. Oldroyd went to the laundromat and determined that the coin boxes on 14 washers and 2 dryers had been opened. Based on the money remaining in the machines that had not been tampered with, he estimated that roughly $600 to $800 was missing. Oldroyd also succeeded in opening several of the machines with one of the lock picks found in defendants' possession.

Defendants were tried before a jury on March 29, 1979, and found to be guilty as charged. Each was thereafter sentenced to an indeterminate term not to exceed five years in the Utah State Prison. On appeal, defendants challenge the propriety of their detention and questioning, the search of their vehicle and clothing, and the evidence as to the value of the property alleged to have been taken.

Both the defense and prosecution rely upon the case of *Terry v. Ohio*[4] as it pertains to "stop and frisk" and "search and seizure" questions.[5] The crucial language contained in *Terry* reads as follows:

> ... there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." And in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing

more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. [Citations omitted.]

Though there may be no probable cause to make an arrest, a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for investigating possible criminal behavior.[6] As this Court has stated:

> When a police officer sees or hears conduct which gives rise to suspicion of crime, he has not only the right but the duty to make observations and investigations to determine whether the law is being violated; and if so, to take such measures as are necessary in the enforcement of the law.[7]

Each case must therefore be considered on its own facts. In the instant case, Officer Geslison knew that there had been several thefts committed in the area, and he observed that defendants were alone in the laundromat. From his previous encounter with them, he knew that they were from out-of-town and that, on the prior occasion, they had been in possession of contraband and a bag full of coins. All of this gave the officer an objective credible reason[8] to enter the laundromat, a public place where he had a right to be, and to ask defendants what they were doing and for identification. There was no improper seizure or detention in the questioning.

Defendants contend alternatively that if the questioning were proper, the evidence found in the search of the car and their clothing was nevertheless inadmissible.

As to the search of the vehicle, the state claims that under *Rakas v. Illinois*,[9] defendants had no legitimate expectation of privacy in the automobile inasmuch as they had no possessory or proprietary interest in it.[10]

---

**4.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**5.** Amendment IV, Constitution of the United States; Article I, Section 14, Constitution of Utah.

**6.** *People v. Mangum*, 189 Colo. 246, 539 P.2d 120 (1975).

**7.** *State v. Folkes*, Utah, 565 P.2d 1125 (1977).

**8.** *People v. LaPene*, 40 N.Y.2d 210, 386 N.Y. S.2d 375, 352 N.E.2d 562 (1976).

**9.** 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**10.** The vehicle was not registered to either defendant.

The parties also argue the applicability of the automobile exception [11] to the warrant requirement. However, since the search was made only after receiving Parrett's consent, we need not address other theories which might otherwise bear upon the lawfulness of the search.

■■■ Defendants concede that the search was made pursuant to consent, but they claim that the consent was not voluntarily given—that it was granted only in submission to the officers' show of authority. Clearly the prosecution has the burden of establishing from the totality of the circumstances that the consent was voluntarily given; [12] however, the prosecution is not required to prove that defendant knew of his right to refuse to consent in order to show voluntariness. Factors which may show a lack of duress or coercion include: 1) the absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the owner of the vehicle; and 5) the absence of deception or trick on the part of the officer. [13] In the instant case, when Officer Geslison asked defendants for permission to search the automobile, all he had done was ask them for their identification and ask preliminary questions. Defendants were not in custody at the time, [14] and although Officers Mock and Leatham arrived before consent was given, Mock did not enter the laundromat and Leatham entered just as consent was being given; thus, the presence of additional officers did not create an undue show of authority. When Officer Geslison requested permission to search, he did not claim any authority to search or deceive defendants into thinking he had a search warrant. He simply asked if he could search the automobile, to which Parrett responded "Yes," or "Yes, you can go ahead and search it." Finally, none of the officers used force or threats of force to obtain the consent. Under the totality of circumstances test, the state met its burden of proving that the consent to search the automobile was voluntarily given.

Defendants contend that the search of their clothing, i. e., the officers' request that they empty their pockets, was unlawful and the evidence found therein should have been suppressed.

■■■ To answer this contention, we first address the question of what constitutes probable cause for arrest without a warrant. The basic standard was set forth by the United States Supreme Court in *Beck v. Ohio*,[15] later stated by this Court as follows:

> The determination should be made on an objective standard: whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense.[16]

■■■ Although the search itself precedes the formality of arrest,[17] the search is still incident to arrest if at the time of the search the officer had sufficient probable cause to make the arrest.[18] As indicated *supra*, Geslison was reasonably suspicious as he entered the laundromat and questioned defendants. As he questioned them, the officer noticed bulges in all four of Whittenback's pockets as well as two lock picks of the type used to open the coin boxes on washing machines resting on the floor be-

---

11. See *State v. Limb*, Utah, 581 P.2d 142 (1978), and cases cited therein.

12. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

13. *People v. Hayhurst*, Colo., 571 P.2d 721 (1977).

14. Note also that the fact of custody alone is not enough to demonstrate coerced consent. *State v. White*, Utah, 577 P.2d 552 (1978); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

15. 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

16. *State v. Hatcher*, 27 Utah 2d 318, 495 P.2d 1259 (1972).

17. See footnote 3, supra.

18. *State v. White*, footnote 14, supra.

low where Whittenback was sitting. Geslison had the requisite probable cause to search defendants, and the search of defendants' pockets was not unduly broad.[19]

Defendants' final contention is that the state failed to offer substantial, competent evidence of the value of the property alleged to have been taken and therefore failed to establish an essential element of the crime. The test on appellate review of the sufficiency of evidence to prove an element of an offense has been stated by this Court as follows:

> The weight of evidence and the credibility of witnesses are reserved exclusively for the jury, and this Court will not interfere unless the evidence is found to be so lacking and insubstantial that reasonable men could not possibly have reached a verdict beyond a reasonable doubt.[20]

In support of the allegation that the property stolen was valued at more than $250 but less than $1,000,[21] the state called the owner of the laundromat, William Oldroyd, to testify. Oldroyd testified that he had owned and operated the laundromat for 12 years. When called to his establishment by the police on March 26, 1979, Oldroyd discovered that 14 of his 50 washing machines had been broken into as well as 2 of his 25 dryers. Those machines that had been broken into had no coins in them at all. After counting the money remaining in the other machines, Oldroyd determined that roughly $600 to $800 was missing.[22] The total amount of money found in defendants' possession was nearly $600, which, when taken with Oldroyd's estimate, establishes beyond a reasonable doubt that more than $250 had been taken.

The convictions and sentences by the lower court are hereby affirmed.

CROCKETT, C. J., and WILKINS, J., concur.

MAUGHAN and STEWART, JJ., concur in the result.

---

**19.** See *U. S. v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and *State v. Jackson*, 112 Ariz. 149, 539 P.2d 906 (1975).

**20.** *State v. Logan*, Utah, 563 P.2d 811 (1977).

**21.** A third degree felony under U.C.A., 1953, 76–6–412(1)(b)(i).

**22.** He testified that most of the machines generate approximately the same amount of money.