Kelly SORENSON, Plaintiff
and Appellant,

v.

KENNECOTT–UTAH COPPER COR-
PORATION, a Delaware corpora-
tion, Defendant and Appellee.

No. 930126–CA.

Court of Appeals of Utah.

April 11, 1994.

Reid C. Davis (argued), Stephen W. Cook, Cook & Davis, Salt Lake City, for appellant.

Barbara K. Polich (argued), Kenneth R. Wallentine, Parsons, Behle & Latimer, Salt Lake City, for appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

BILLINGS, Presiding Judge:

Plaintiff Kelly Sorenson appeals from the dismissal of his wrongful termination suit against his employer, Kennecott–Utah Copper Corporation. We affirm.

## FACTS

Sorenson began his employment with Kennecott in March 1974. At the time he was hired he signed various work-related documents, including a company policy statement entitled "1973 General Rules of Conduct"

(the 1973 Code). It provided in relevant part:

> Listed below are the general rules of conduct that apply to all Kennecott personnel while on company operating property. These rules are not all-inclusive, but serve as a guide to good company citizenship. Violation of these rules is cause for either (1) written warning, or (2) suspension subject to hearing for discipline purposes. Such a hearing can result in penalty layoff or discharge, depending upon the seriousness of the offense.

Following the introductory paragraphs, the 1973 Code listed prohibited offenses, such as insubordination, drinking on the job, sleeping on the job, fighting, violating safety and operating rules, or carrying personal weapons or firearms. At his initial interview, the Human Services Director informed Sorenson that the 1973 Code set forth the means by which violations of company rules would be addressed. Sorenson signed the document to show that he had read it.

The 1973 Code was superseded in 1974, 1977, 1980, 1984, and 1986. The subsequent versions clarified: "These rules supersede those in effect prior to this date," or, "This notice supersedes all previous notices issued to employees regarding rules of conduct." Unlike the 1973 version, none of the subsequent Codes specified that employees would receive either a written warning or suspension for rule violations. Significantly, the most recent version, the 1986 Code, states only that "[e]mployees who do not conform to this general code of conduct will be subject to discipline." Included among the 1986 Code's non-exhaustive list of violations is unsatisfactory work performance.

Sorenson was hired as a salaried employee and remained so throughout the course of his employment.[1] He began in 1974 as a metallurgical engineer at Kennecott's Magna smelter. From mid–1974 until early 1986, he also filled in for various foremen at that facility. Then, during the shutdown of the Magna smelter in 1985 and 1986, he was assigned non-supervisory work as well as

---

1. Other workers at Kennecott were classified as "union" employees whose employment was governed by a collective bargaining agreement be-

tween their union and Kennecott. Because Sorenson was salaried, he was not covered by that agreement.

duties in the environmental department. When the smelter reopened in 1987, he served as the anode plant foreman, in a position two grades lower than the one he had previously occupied. In 1988 he was transferred to the Bonneville concentrator, where he remained until his termination on January 31, 1989.

Sorenson's employment required that he supervise employees, both salaried and union. As a result, Sorenson was required to attend several management training seminars. He testified that at these seminars he was instructed in numerous management-related topics, including progressive discipline. Sorenson claimed that progressive discipline was defined as first utilizing verbal warnings, followed by written warnings, then suspension, and finally a hearing before termination. However, he admitted at trial that some serious offenses could lead to immediate termination. Sorenson also claimed he understood that progressive discipline applied to all employees, both salaried and union. One of Sorenson's supervisors likewise testified that progressive discipline applied equally to all employees and that he taught this principle in one of the training seminars. Both Sorenson and his supervisor recounted several instances in which progressive discipline was applied to salaried employees, although in different fashions. Moreover, they testified that the managers sought novel ways of disciplining these salaried employees and that they had to be "creative" in their approach.

Members of Kennecott management stated that salaried employees were terminable at-will, with or without notice. They also stated that the procedures of progressive discipline taught at the training seminars applied only to union employees and that Kennecott had no policy requiring cause or notice before termination of salaried employees.

During the course of his employment, Sorenson generally received favorable performance evaluations. However, on at least one occasion in early 1988, his overall performance was rated as substandard. In addition, Sorenson's manager testified that when Sorenson was transferred to the Bonneville facility, he advised Sorenson that it might be his "last chance" to "redeem himself." After his transfer, Sorenson's supervisors toured the concentrator plant and expressed to him their dissatisfaction with its condition. Sorenson admitted that he had several conversations with them concerning the problems they uncovered.

Shortly after the discovery of the problems at the Bonneville concentrator, Sorenson was terminated for inadequate performance on January 31, 1989. He commenced this action in 1989, asserting that he and Kennecott had an implied-in-fact agreement entitling him to progressive discipline, including notice, a hearing, and cause for termination.

The trial court bifurcated the proceedings on the issues of liability and damages. The issue of Kennecott's liability was tried to the bench in January 1992. After four days of trial, at the close of Sorenson's evidence, Kennecott moved for a dismissal pursuant to Rule 41(b) of the Utah Rules of Civil Procedure. The trial court granted Kennecott's motion, concluding that Sorenson had not rebutted the presumption that he was an at-will employee and thus that Kennecott had the right to terminate Sorenson "at its discretion." Accordingly, the trial court dismissed the matter with prejudice and on the merits.

Sorenson appeals from the dismissal. He argues that the trial court erred in (1) finding that the 1973 Code did not rebut the at-will presumption, (2) finding that Kennecott's historical application of progressive discipline to salaried employees was merely "good management" and hence insufficient to rebut the at-will presumption, and (3) failing to consider properly the testimony of Sorenson's supervisor as rebutting the at-will presumption. In response, Kennecott asserts that the trial court properly considered witness testimony and correctly concluded that Sorenson failed to rebut the presumption. In the alternative, Kennecott contends that even if Sorenson did prove an implied-in-fact contract, he had only the right to notice of unsatisfactory performance, which notice he received prior to his termination.[2]

2. In his reply brief, Sorenson attacks Kennecott's alternative argument and advances a novel theo-

## STANDARD OF REVIEW

Rule 41(b) of the Utah Rules of Civil Procedure allows a defendant in a bench trial to move for a dismissal if, after the plaintiff has completed its presentation of evidence, "upon the facts and the law the plaintiff has shown no right to relief." Furthermore, "[i]f the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)." Utah R.Civ.P. 41(b).

■ Dismissal under Rule 41(b) is appropriate in two circumstances: when the plaintiff has failed to adduce sufficient evidence to establish a prima facie case, or when the trial court is not persuaded by the evidence introduced. *Lemon v. Coates,* 735 P.2d 58, 60 (Utah 1987); *accord Handy v. Union Pac. R.R. Co.,* 841 P.2d 1210, 1214–15 (Utah App. 1992). The trial court may grant a Rule 41(b) motion even if the plaintiff has made out a prima facie case. *Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 252 (Utah 1985). In effect, the rule allows the trial court " 'to weigh the evidence, to draw inferences therefrom and, if it finds the evidence insufficient ... to render a decision for the defendant on the merits.' " *Id.* (quoting *Winegar v. Slim Olson, Inc.,* 122 Utah 487, 491, 252 P.2d 205, 207 (1953)).

■ The two variants of dismissal under Rule 41(b) implicate different standards of review. First, we review for correctness a dismissal based upon the failure to establish a prima facie case, which is a question of law. *Handy,* 841 P.2d at 1215. Second, we apply the clearly erroneous standard to the findings supporting a dismissal granted because the trial court was not persuaded by the evidence. *Id.* at 1215 n. 7. In undertaking our review of a Rule 41(b) dismissal, we view the evidence in a light most favorable to the trial court's findings. *Lawrence v. Bamberger R.R. Co.,* 3 Utah 2d 247, 250, 282 P.2d 335, 337 (1955). Finally, we are guided by case law characterizing the question of the existence of an implied-in-fact employment contract as a question of fact. *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997, 1001 (Utah 1991); *accord Gilmore v. Community Action Program,* 775 P.2d 940, 942 (Utah App.1989), *cert. denied,* 789 P.2d 33 (Utah 1990).[3]

## ANALYSIS

■ In *Rose v. Allied Development Co.,* 719 P.2d 83 (Utah 1986), the Utah Supreme Court recognized the "at-will" rule, whereby an employment relationship existed at the will of either party and could be terminated by either party, and described its limitations as imposed by state and federal legislation. *Id.* at 84–85. The court revisited the employment-at-will doctrine in the seminal case of *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033 (Utah 1989) (plurality opinion), undertaking a sweeping analysis of the doctrine's history and converting it from a rule to a rebuttable presumption. The plurality opinion described three primary exceptions to the at-will rule:

First, where an employee is fired in a manner or for a reason that contravenes a recognized and established public policy, the at-will rule will not serve to insulate the employer from liability. Second, courts have clarified the requirements for finding an express or implied contract term for employment for a certain period or a covenant for dismissal only with cause.

---

ry, namely that Kennecott cannot unilaterally revoke the 1973 Code by enacting subsequent Codes because the 1973 Code was, in effect, an express, bilateral contract. However, because this issue was not addressed below and was argued only in plaintiff's reply brief, to which Kennecott has no opportunity to respond, we decline to address it. *State v. Brown,* 853 P.2d 851, 854 n. 1 (Utah 1992).

**3.** However, in light of the supreme court's recent decision in *State v. Pena,* 869 P.2d 932 (Utah 1994), it is uncertain whether this application of the clearly erroneous standard will persist. *Pena*

suggests that "some degree of deference may be given a trial court's application of a particular principle of law to specific facts." *Id.* at 938. In the instant case, then, some intermediate level of deference may be due the trial court's application of the implied-in-fact employment contract doctrine to the specific facts at issue. However, because we are uncertain as to *Pena's* scope, we follow those supreme court cases characterizing the existence of an implied-in-fact contract as a question of fact. We also note that the choice of standard of review in this case is not outcome determinative.

Finally, many courts have relied upon the implied covenant of good faith and fair dealing and have granted the discharged employee a cause of action to sue when the employer's conduct breaches that implied covenant.

*Id.* at 1041–42.

The import of *Berube* for this case is the plurality's acceptance and articulation of the implied-in-fact contract exception to the at-will rule. In *Berube,* the plaintiff was hired as a sales clerk and promoted through the ranks based on her ability and strong evaluations. *Id.* at 1035. She was informed of her employer's written disciplinary action policy, which stated that it "would not terminate employment without prior warning except for specific reasons, including failure to pass or refusal to take a polygraph examination." *Id.* at 1036. The plaintiff admitted that her employment was of no set duration but expected that she would be terminated only for cause. *Id.* She was subsequently discharged for failing to take a third polygraph examination after submitting to two prior exams, both of which she was led to believe she had passed. *Id.* at 1036–37. With respect to the third test, she did not refuse to submit to it but rather requested that it be postponed. *Id.* at 1037. Her request was denied and she was terminated the next day. *Id.*

In analyzing the implied or express contract exception, the plurality opinion described the at-will rule as merely a rule of contract construction, rather than a legal principle, which could be "overcome by an affirmative showing by the plaintiff that the parties expressly or impliedly intended a specified term or agreed to terminate the agreement for cause alone." *Id.* at 1044. Relevant evidence might include "employment manuals, oral agreements, and all circumstances of the relationship which demonstrate the intent to terminate only for cause or to continue employment for a specified period." *Id.* However, the court made clear that "[a]n implied-in-fact promise cannot, of course, contradict a written contract term." *Id.*

Applying that standard, three justices concluded a reasonable factfinder could have found that Berube had rebutted the at-will presumption, that the agreement contained an implied-in-fact term, and that the employer had breached that term. *Id.* at 1047–1048 (Durham, J., joined by Stewart, J.); *Id.* at 1052 (Zimmerman, J., concurring in the result and agreeing with lead opinion on that point). Accordingly, the court remanded the implied-in-fact contract claim for consideration by a jury.

The supreme court took the opportunity to summarize *Berube* and its progeny in *Johnson v. Morton Thiokol, Inc.,* 818 P.2d 997 (Utah 1991). The court articulated these guiding principles in interpreting implied-in-fact claims:

> It is clear that the employee has the burden of establishing the existence of an implied-in-fact contract provision, that is, the employee must show that although there was no express contract provision to this effect, the parties nevertheless agreed that the employment would not be at will. If the parties actually intended such an agreement and the agreement is of such a nature that it is possible to operate as a contract term, a court will give effect to the parties' intentions by enforcing the agreement as an implied-in-fact contract provision. The existence of such an agreement is a question of fact which turns on the objective manifestations of the parties' intent. As a question of fact, the intent of the parties is primarily a jury question. However, if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide the issue as a matter of law.

*Id.* at 1001 (footnotes omitted). Furthermore, the court applied a unilateral contract analysis, requiring "a manifestation of the *employer's intent* that is *communicated to the employee* and *sufficiently definite* to operate as a contract provision" such that "the employee can *reasonably* believe that the employer is making an offer of employment other than employment at will." *Id.* at 1002 (emphasis added) (footnotes omitted). In defining the evidence relevant to such an analysis, the court noted that employee manuals,

bulletins, and other express statements have previously been considered. However, these are not the exclusive types of permissible evidence; the evidence need only satisfy the requirements of a unilateral offer. *Id.*

Applying those principles to Johnson's case, the court upheld the trial court's conclusion that no implied contract provision limited Thiokol's right to terminate him at will. Johnson had no express contract with Thiokol but based his allegations on an employee handbook that announced Thiokol's policy concerning discipline, evaluation, and grievance procedures, including discussion, notice, suspension, and termination; in addition, it contained a clear and conspicuous disclaimer that the terms of the manual "do not create a binding contract or any other obligation or liability on the company." *Id.* at 999, 1003. The manual further provided that employment was "for no set period and may be terminated without notice and at will at any time by you or the company." *Id.* at 1003. Because of this disclaimer, Johnson was not entitled to argue that he could only be fired for cause. *Id.* Furthermore, although subsequent agreements could have modified the at-will relationship, Johnson's mere allegations that Thiokol complied with the handbook during his evaluations and termination did not demonstrate Thiokol's communicated intention to alter the employment relationship. *Id.* at 1004.

Most recently, in *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331 (Utah 1992), the court considered whether a manager modified an employee's at-will status by informing the employee that the company followed disciplinary procedures and by subsequently providing warnings to four employees. *Id.* The plaintiff was told verbally and in writing that her status was at-will, but she maintained that the warnings were "inconsistent with the at-will policy and constituted a modification of the handbook terms." *Id.* at 332–33. The court disagreed. Following the approach set forth in *Johnson*, 818 P.2d at 1002, the court concluded that the warnings "were not sufficiently definite to constitute a contract term because they were too inconsistent" and "the manner in which [they] were issued varied considerably." *Hodgson*, 844 P.2d at 334.

Significant to this case, the *Hodgson* court found that "the warnings could not reasonably justify an employee's conclusion that she could be discharged only after receiving a warning," particularly in light of a statement in the handbook that employees had "no right to rely on any program of progressive discipline in effect." *Id.* Stated differently, the plaintiff's subjective belief that she was entitled to a pretermination warning did not meet the unilateral contract standard of reasonable, objective, belief announced in *Johnson. Id.*

To summarize the law, we presume employment to be at-will absent evidence to the contrary. An employee may rebut that presumption by demonstrating a manifestation on the part of the employer, communicated to the employee and sufficiently definite to induce a reasonable belief that employment is other than at-will. Relevant evidence to carry that burden may include employee handbooks, company manuals, bulletins, oral statements, and the employer's course of conduct.

■ At trial, Sorenson relied on five factors that he claimed created an implied-in-fact contract entitling him to progressive discipline and termination only for cause: (1) the 1973 Code, signed by the parties; (2) Kennecott's management training regarding progressive discipline; (3) Kennecott management's alleged oral statements that Sorenson and other supervisory personnel were entitled to progressive discipline; (4) Kennecott's historical application of progressive discipline to salaried employees; and (5) Kennecott's use of regular performance evaluations. The trial court disagreed, finding neither an implied contract for a definite term nor an implied term requiring progressive discipline. The trial court found in relevant part:

(1)(a) that at the time the plaintiff was hired by Kennecott, there was no particular discussion as to whether he would be an at-will employee or whether he could be terminated for cause only, whether he was employed for any particular term, or whether he was entitled to any kind of progressive discipline.

(b) that a policy of progressive discipline had been in place at the Kennecott plant

for some time; it was required by contract for the union represented employees and it was applied in a much less formal manner to management employees, but for the most part, progressive discipline was practiced just as a matter of good management.

. . . .

(f) that, although plaintiff made sufficient or significant improvements in the condition of the Bonneville concentrator . . . his performance was clearly not satisfactory to management for one reason or another, and he was terminated for that reason.

(2) Based upon the evidence presented, the Court finds that plaintiff has failed to meet his burden of proof that there existed a contract between Kennecott and the plaintiff for either continued employment or for progressive discipline.

(3) Based upon the evidence presented, the Court also finds that, although progressive discipline was being practiced, it was never part of a contract.

(4) The Court does not find either [the 1973 Code], the seminars, or any of the subsequent documents to be sufficient evidence to convince the Court that there was ever an implied-in-fact contract between plaintiff and Kennecott.

■■■ Sorenson challenges the trial court's findings of fact and its grant of dismissal under Rule 41(b). In considering his challenge to the trial court's findings of fact, we will not disturb those findings unless they are "clearly erroneous." *Lemon v. Coates,* 735 P.2d 58, 60 (Utah 1987). Findings are clearly erroneous if they are against the clear weight of the evidence or if the appellate court reaches a definite and firm conviction that a mistake has been made. *Southern Title Guar. Co. v. Bethers,* 761 P.2d 951, 954 (Utah App.1988); *see also* Utah R.Civ.P. 52(a). Furthermore, to prevail on appeal, Sorenson must marshal all the evidence supporting the findings and then establish that, if viewed in the light most favorable to the trial court, the evidence is "legally insufficient" to support the findings. *Doelle v. Bradley,* 784 P.2d 1176, 1178 (Utah 1989).

■■■ This he has not done. Instead, he does little more than summarize at length his trial testimony and that of his witnesses in support of his position. He has not stated the facts upon which the trial court based its findings and then demonstrated that those findings were clearly erroneous. Furthermore, our own review of the record reveals ample evidence contradicting Sorenson's assertions. Finally, with respect to testimony that the trial court allegedly "ignored," we reiterate the well-settled principle that an appellate court will not second-guess a trial court on issues of witness credibility. *Embassy Group, Inc. v. Hatch,* 865 P.2d 1366, 1371 (Utah App.1993); *see also* Utah R.Civ.P. 52(a). We therefore accept the trial court's findings on appeal.

Sorenson's challenge on appeal is in essence directed at the trial court's application of the implied-in-fact contract doctrine. This implicates the second variant of Rule 41(b) dismissal, i.e., the trial court was not persuaded by the evidence presented, which we review under the clearly erroneous standard. *Handy v. Union Pac. R.R. Co.,* 841 P.2d 1210, 1215 n. 7 (Utah App.1992).

At the time Sorenson was hired, he was asked to read and sign the 1973 Code, which he maintains established an implied-in-fact contract of employment requiring progressive discipline prior to discharge. The trial court disagreed and found that neither the 1973 Code nor subsequent Codes created such a relationship. The 1973 Code contained no language expressly modifying the at-will relationship. It did suggest, however, that for the nineteen specified offenses, written warnings or suspension pending a hearing would be utilized, with the possibility of discharge for serious offenses. Significantly, the 1973 Code made no mention of the quality of an employee's work performance; rather, the prohibited activities were behaviors inconsistent with "good company citizenship," such as fighting, sleeping, consuming intoxicants, carrying weapons, and the like.

Even if we held that the 1973 Code modified the employment contract and mandated progressive discipline with respect to the nineteen specified offenses, that ruling would not help Sorenson. He did not violate a

proscribed offense but instead failed to perform satisfactorily. The 1973 Code limited Kennecott's right to terminate only for transgressions of the nineteen rules; Kennecott's right to terminate at-will for other offenses remained intact. *See Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483, 486 (Utah 1989).

Furthermore, because the 1973 Code was expressly superseded on numerous occasions, Sorenson's reliance upon it is misplaced. Each subsequent version of the Code contained language expressly notifying employees that the new version superseded all previous rules of conduct. As a result, the version applicable to Sorenson's 1989 discharge was the 1986 Code and not the 1973 Code.

All versions subsequent to the 1973 Code omitted the language that required written warning or suspension subject to a hearing. Each stated only that violation of the rules would result in "discipline." Such an amorphous threat of discipline cannot constitute a manifestation by the employer that is "sufficiently definite" to demonstrate an intent to form a relationship other than at-will. *Johnson,* 818 P.2d at 1001; *accord Kirberg v. West One Bank,* 872 P.2d 39, 41 (Utah App. 1994). Moreover, as defined in the 1973 Code, "discipline" included "discharge," depending upon the seriousness of the offense. As such, Kennecott's admonition to employees that violation of the rules could lead to discipline clearly contemplated the possibility of discharge.

Sorenson looks to the curriculum of the management training seminars he attended as part of his supervisory duties at Kennecott as support for his argument. He testified that he was instructed to apply the tenets of progressive discipline to "all employees" and that no distinction was made between salaried and union employees. His supervisor, Jerry Hansen, agreed with that assessment of the training seminars.

However, the trial court concluded that the facts supported a finding that progressive discipline was required only for union employees and that for salaried employees it was applied in a less formal manner "as a matter of good management." Ample evi-

dence in the record supports this finding. For example, numerous affidavits from management personnel stated definitively that Kennecott policy did not require progressive discipline and did not alter the at-will relationship. Furthermore, the Management Training Manual submitted at trial was written in terms suggesting that it applied to union employees. Interestingly, the Manual in several places counseled supervisors to contact a shop steward or union representative when confronted with a problem employee, which tends to bolster Kennecott's assertion that the Manual applied only to union employees.

Thus, the trial court was faced with conflicting evidence on the purpose of the training seminars and the Manual. That conflict suggests anything but a clear manifestation of the employer's intent to alter the at-will relationship with respect to salaried employees upon which Sorenson could reasonably rely. *Johnson,* 818 P.2d at 1002. Further, that conflict required the trial court to make credibility determinations and assessments of the weight of evidence which this court will not second-guess. *Embassy,* 865 P.2d at 1371.

In addition, the fact that Sorenson was informed of his duty to apply progressive discipline in supervising other employees does not necessarily bestow upon him the right to receive the benefit of such procedures. *Loose v. Nature–All Corp.,* 785 P.2d 1096, 1097 (Utah 1989). Nor can it be argued that the failure to expressly limit those training materials to union employees constitutes a definite manifestation of Kennecott's intent to apply progressive discipline to salaried employees. *Kirberg,* 872 P.2d at 41 (criticizing employee for failing to point to "affirmative and definite acts" of employer demonstrating clear intent to modify at-will relationship).

 As his third and fourth bases for an implied-in-fact contract, Sorenson relies upon oral statements and Kennecott's historical application of progressive discipline to salaried employees. Oral statements may rebut the at-will presumption by proving an implied-in-fact contract. *Sanderson v. First*

*Sec. Leasing Co.,* 844 P.2d 303, 307 (Utah 1992). However, the practice of warning other employees will not prove an implied-in-fact contract when the warnings are not definite and consistent. *Hodgson,* 844 P.2d at 334.

Here, the trial court found that plaintiff's evidence demonstrated only a practice, not a policy, of applying progressive discipline to salaried employees. That practice may be a sound one from an employer's perspective without becoming a mandate that such practices must be utilized in every instance. Absent a more substantial showing, that practice does not necessarily translate into a company policy, as the trial court found. Sorenson testified to discussions of warnings that were sporadic, vague, and inconsistent in nature. Moreover, he stated that he and the other managers often looked for novel or "creative" ways of disciplining salaried personnel. If a definite policy such as the one he described had truly been in place, it is doubtful that he and his colleagues would have spent time and energy trying to devise new, nonstandard means of disciplining employees.

Yearly performance evaluations form the last leg upon which Sorenson's alleged implied-in-fact contract stands. However, we have uncovered no Utah precedent establishing that regular performance appraisals modify the at-will relationship. Such appraisals were used in *Caldwell,* 777 P.2d at 484, yet did not preclude summary judgment in favor of the employer.

Taken as a whole and viewed in a light most favorable to the trial court's findings, the evidence supports the trial court's determination that Sorenson failed to rebut the presumption of at-will employment. Thus, the dismissal under Rule 41(b) was not clearly erroneous.

## CONCLUSION

Sorenson failed to prove the existence of an implied-in-fact employment contract and therefore did not rebut the presumption that his employment with Kennecott was at-will. Consequently, Kennecott had the right to terminate his employment at its discretion. We therefore affirm the trial court's dismissal pursuant to Rule 41(b) of the Utah Rules of Civil Procedure.

GREENWOOD, J., concurs.

BENCH, J., concurs in result.