STATE of Utah, Plaintiff and Appellee,

v.

**Anthony Martin ARCHULETA,
Defendant and Appellant.**

No. 960299–CA.

Court of Appeals of Utah.

Oct. 18, 1996.

Ronald S. Fujino, Salt Lake Legal Defender Association, Salt Lake City, for Defendant and Appellant.

Jan Graham, Attorney General, and Christine F. Soltis, Assistant Attorney General, Salt Lake City, for Plaintiff and Appellee.

Before ORME, DAVIS, and JACKSON, JJ.

## OPINION

ORME, Presiding Judge:

Defendant Anthony Archuleta, convicted of murder, appeals the trial court's refusal to suppress evidence obtained during a warrantless search of his father's home. He contends that exigent circumstances were not present and that his father's consent to search the home was involuntary because it was the product of coercion and duress. We affirm.

## FACTS

"In reviewing the trial court's ruling, we recite the facts in the light most favorable to the trial court's findings." *State v. Anderson,* 910 P.2d 1229, 1230 (Utah 1996); *State v. Pena,* 869 P.2d 932, 936 (Utah 1994).

On February 3, 1994, defendant left his father's home and walked across the street to a gas station to use a public pay phone. A friend accompanied him. Defendant telephoned another friend to request a ride to his mother's house. After the telephone call, defendant and his friend waited at the pay phone for the promised ride.

Shortly thereafter, a pickup truck driven by Roland Zahorka pulled into the gas station and up to the pay phone. The truck stopped abruptly near the spot where defendant was standing. As the truck stopped, defendant struck the top of the truck's hood with his fist. An altercation ensued between defendant and Zahorka, primarily involving their shoving one another. Defendant then fatally shot Zahorka. After the shooting, defendant and his friend ran from the scene.

Salt Lake County Deputy Sheriff Timothy Langley arrived at the scene at 6:48 p.m. in response to a radioed report that a shooting had occurred in the area of 3900 South and 300 East in Salt Lake County. After other deputies arrived and began securing the crime scene, Deputy Langley promptly began his investigation. Deputy Langley learned from witnesses at the scene that two teenage Hispanic males, who had been drinking beer, had fled on foot in a northeasterly direction. Deputy Langley was then approached by two children who informed him that they had heard the gunshot and saw two teenage Hispanic males run into a nearby house. Deputy Langley proceeded northeasterly, in the direction of the house, and soon discovered a broken beer bottle and still-foaming beer.

Upon arriving at the residence, Deputy Langley summoned other officers, who were then posted around the house to prevent a possible escape. Meanwhile, police dispatch was unsuccessful in attempting to make telephone contact with the occupants. At that point, officers decided to approach the house. Deputy Langley, along with several other officers who had their guns drawn, walked up the stairs of the porch. Defendant's intoxicated uncle came out of the house and was moved along to other officers on the lawn. Deputy Langley then observed a Hispanic male seated in a chair and apparently watching television. Deputy Langley ordered the man, later identified as James Archuleta, defendant's father and owner of the residence, to step outside. As Mr. Archuleta stepped outside, he was ordered to lay down on the front lawn. He was subjected to a pat-down search and was found not to be in possession of any weapon. He was then allowed to stand, whereupon the deputies holstered their guns or held them in a non-threatening position.

Mr. Archuleta identified himself as the owner of the residence and reported that his son and a friend had recently entered the house requesting to be immediately driven away from the area. Mr. Archuleta was informed that deputies were searching for the persons who had just participated in a shooting across the street. He then gave the deputies permission to enter the home and search for the suspects.[1]

---

1. At the suppression hearing, Mr. Archuleta testified that the officers never asked for his consent to search the house until after they had forcibly entered and seized defendant and his friend. He

Deputies Langley and Robert Sampson entered the house, where they found and detained defendant and his friend. The officers then conducted a visual "sweep" within the home to ensure that no other suspect or person was present who might pose a threat to the officers. No item of evidence was seized during this initial sweep of the house.

No further search was conducted until the arrival of Detective Dick Judd, a supervising crime scene investigator. Detective Judd spoke with James Archuleta about the crime being investigated and explained that he had information from the deputies that led him to believe that evidence of the shooting would be discovered in the residence. He requested permission from James Archuleta to allow officers to search the home for such evidence. James Archuleta then signed a hand-drafted document which recorded his consent to allow the search of his home. As a result of the search conducted pursuant to the written consent, a .22 caliber pistol, numerous rounds of .22 caliber ammunition, and other items of physical evidence were seized.

Prior to trial, defendant moved to suppress the physical evidence seized from his father's home on the night of his arrest. Following an evidentiary hearing, the motion was denied. Defendant was subsequently convicted by a jury of murder, a first degree felony, in violation of the statute now codified in Utah Code Ann. § 76-5-203 (Supp.1996). Defendant appeals, challenging only the denial of his motion to suppress.

## ISSUES ON APPEAL

Defendant contends the first consent to search the home, given verbally by James

Archuleta, was not voluntary, as it was the product of coercion and duress.[2] Defendant argues that the second search, based upon Mr. Archuleta's written authorization, was not sufficiently attenuated from the allegedly unlawful first search so as to be legally valid.

## ANALYSIS

A "trial court's ultimate conclusion that a consent was voluntary or involuntary is to be reviewed for correctness." *State v. Thurman*, 846 P.2d 1256, 1271 (Utah 1993). However, "[t]he trial court's underlying factual findings will not be set aside unless they are found to be clearly erroneous." *State v. Harmon*, 910 P.2d 1196, 1199 (Utah 1995); *Thurman*, 846 P.2d at 1271.

The issue of whether a consent to search is voluntary depends upon " 'the totality of all the surrounding circumstances—both the characteristics of the [person consenting] and the details of' police conduct." *State v. Arroyo*, 796 P.2d 684, 689 (Utah 1990) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). *Accord Harmon*, 910 P.2d at 1206; *Thurman*, 846 P.2d at 1262–63. "A 'consent' that is the product of duress and coercion is not a consent at all." *Harmon*, 910 P.2d at 1206. *Accord Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). Factors indicating a lack of duress or coercion include the absence of a claim of authority to search by the officers, a mere request by an officer to

---

testified that the officers then took him back into the house and only at that time did they request his consent to search the home for a weapon. The trial court apparently credited the officers' testimony over that of Mr. Archuleta. Because we must defer to the trial court's credibility determinations, we cannot say its findings concerning consent are clearly erroneous. *See* Utah R. Civ. P. 52(a); *Sorenson v. Kennecott–Utah Copper Corp.*, 873 P.2d 1141, 1147 (Utah App.1994); *Embassy Group, Inc. v. Hatch*, 865 P.2d 1366, 1371 (Utah App.1993). Defendant also points to several inconsistencies in the officers' testimony. However, we do not regard the officers' testimony as being so pervasively inconsistent as to make it incredible as a matter of law.

**2.** Defendant's argument on appeal that his father's expressed consent was not voluntary is at odds with the father's testimony below, which was to the effect that he did not voice *any* consent to the initial search and that the police just barged in without his permission. *See supra* note 1. Defendant's approach on appeal reflects the reality of the record before us and underscores the posture of this appeal. Defendant tacitly recognizes the trial court's *factual* findings are not clearly erroneous and will not be disturbed on appeal. Defendant's primary contention, then, is that we should conclude that the facts, even as found by the trial court, demonstrate that the verbal consent found by the trial court to have been given was not voluntary as a matter of law.

conduct a search, cooperation by the owner of a residence, and the absence of deception or trick on the part of the officer. *State v. Whittenback,* 621 P.2d 103, 106 (Utah 1980).

Each of these factors is satisfied in this case, given the facts as found by the trial court. No assertions were made to James Archuleta that the officers had the authority to search his home. Rather, they merely requested his permission. Furthermore, at no time did the officers use trickery or deception to obtain his consent. Once the officers determined that he did not match the description of the teenage suspects and that he did not possess any weapons, they holstered or lowered their sidearms, permitted him his freedom, and fully explained the basis for their investigation and why they believed the suspects were in the house. After the initial encounter, James Archuleta was cooperative and even volunteered the information that his son and a friend had recently entered the house requesting to be driven immediately from the area.

An additional factor indicating a lack of duress or coercion is the absence of a show of force by an officer. *Id.* Indeed, defendant's main contention is that the officers' show of force made the consent a product of duress and coercion. However, we agree with the trial court that at the time of the oral consent, the initial show of force was over and its effect had substantially dissipated. Therefore, it did not undermine the voluntariness of the consent, as the following recap demonstrates.

When the officers first ascended the front porch steps, several of them had their guns drawn.[3] After defendant's uncle exited the house on his own initiative, James Archuleta was ordered to step outside. As he stepped out of the house, he was forced to lie on the grass and was subjected to a pat-down search. However, and most importantly for our analysis, once it was determined that he did not match the description of the suspects and that he did not possess a weapon, he was allowed to stand while the officers holstered their guns or held them in a nonthreatening position. From this point on, he was treated as a witness and was no longer physically restrained in any way.

After being informed that the officers were searching for the suspects who had participated in a shooting across the street, James Archuleta voluntarily furnished information about the sudden reappearance of his son and a companion and their desire to be driven away. Only after this conversation did he give his consent to the officers to search the house for the suspects.

Given the trial court's factual findings, which are not successfully challenged, we must conclude that the initial consent to search the home was voluntary and thus valid.[4]

## CONCLUSION

We conclude that the oral consent given by James Archuleta was not the product of coercion or duress. Therefore, the oral consent was valid and supported the initial warrantless entry into the home to search for possible suspects. Thus, the subsequent search premised on Mr. Archuleta's written consent was untainted by any prior illegality. Accordingly, we affirm the trial court's refusal to suppress the evidence and defendant's resulting conviction.

DAVIS, Associate P.J., and JACKSON, J., concur.

---

3. The officers were in the middle of investigating a homicide that had just occurred. No weapon was found at the scene and, therefore, the weapon was presumably still in the suspects' possession. Given these circumstances, we cannot say that the initial show of force was unjustified.

4. Because we conclude that James Archuleta's oral consent to search his house was voluntary, we need not reach the issue of whether exigent circumstances independently justified the warrantless entry. Moreover, because the first consent was valid, we need not address defendant's additional argument that the second search, based upon the written authorization, was not sufficiently attenuated from the initial search. Finally, in view of our disposition, we need not consider the State's argument that any error in the admission of the challenged physical evidence would be harmless.