STATE of Utah, Plaintiff
and Respondent,

v.

Julie HARMON, Defendant
and Petitioner.

No. 930414.

Supreme Court of Utah.

Dec. 14, 1995.

Rehearing Denied Feb. 13, 1996.

Jan Graham, Atty. Gen. and J. Kevin Murphy, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Mark R. Moffat, and Robert K. Heineman, Salt Lake City, for defendant.

ON CERTIORARI TO THE UTAH
COURT OF APPEALS

HOWE, Justice:

We granted certiorari to review the court of appeals' decision in this case. *State v. Harmon*, 854 P.2d 1037 (Ct.App.), *cert. granted*, 868 P.2d 95 (Utah 1993). Defendant Julie Harmon entered a conditional guilty plea to possession of a controlled substance, a third degree felony, while reserving her

right to appeal the trial court's denial of her pretrial motion to suppress evidence. The court of appeals affirmed her conviction. *Id.* at 1041.

## I. FACTS

On November 19, 1991, Detective Robert Russo, an eight-year deputy county sheriff assigned to the Metro Narcotics Task Force, received a tip from an informant that Harmon was distributing narcotics from her home in Magna. At approximately 6:00 that evening, Russo went to her home to ask her for information confirming or rebutting the accusations. When he arrived, Harmon was in her car backing out of her driveway. Russo approached her, identified himself, told her about the tip, and asked if he could search her home. She denied the accusations and refused to allow the search, stating that she was on her way to visit her father, who had recently suffered a heart attack and was returning home from the hospital.

Russo advised Harmon that if she refused to consent, he "could come back at a later time with a [search] warrant," which, he warned, was an "unpleasant experience." [1] She again declined to allow an immediate search. Russo testified that Harmon said she would allow him to search upon her return. However, Harmon testified that she told him that if he wanted to "hang around," she would *talk* to him when she returned.

Harmon then drove to her parents' home. As she drove away, Russo called to check on Harmon's driver's license and was informed that it had been suspended. He decided he would arrest her for driving with a suspended driver's license ("driving on suspension"). Seeing Harmon drive by shortly thereafter, Russo called for an assisting officer in a marked patrol car, and together they stopped her in a parking lot two blocks from her

home. Russo placed her under arrest for driving on suspension, and she was handcuffed by an assisting officer. The testimony differs at this point,[2] but both parties agree that Harmon informed Russo that he would need a warrant if he wanted to search her home.

Russo searched her person incident to the arrest and found pills in a prescription vial with its label scratched off.[3] He also confiscated $285 found in Harmon's purse. Russo placed her in his car, advised her of her *Miranda* rights, and proceeded to take her to the Salt Lake County jail. The other officers stayed behind to impound her car.

Harmon testified that on the way to jail, Russo told her that he knew she had drugs in her home, that he would have to get a warrant, and that they would "tear my house apart." Russo did not recall making these statements. Harmon admitted to Russo that she had been afraid to let him into her home because at one time she had sold drugs and the home contained drug paraphernalia but that she was trying to clean up her act. She told him that if he drove her back to her home, she would sign a search consent form and let him in so that he could retrieve those items. Russo did not promise her any benefit for permitting a search of her home and told her that she would probably go to jail anyway. When Harmon again told Russo she would consent to the search of her home, Russo turned his car around, started back to her home, and called for assistance. On their arrival, Russo again advised her of her *Miranda* rights and read her a written consent form which she signed. Harmon's dog was in the home. Harmon indicated that the dog may try to bite the officers. Russo told her that he would have to shoot her dog if it attacked the officers. After some discussion, the officers permitted Harmon to go into the

---

**1.** At the suppression hearing, Russo admitted that he did not have sufficient information to obtain a warrant.

**2.** Harmon testified that Russo again asked her to search her home and when she refused, he said, "Then, you are going to jail." According to Harmon, she then asked, "[I]f I let you search my house, then you [w]on't take me to jail?" whereupon Russo responded, "You're right."

Russo denied asking to search following the arrest or making any of these statements. The trial court did not make any findings of fact regarding this testimony.

**3.** The criminal charge based on the mislabelled prescription medication was dismissed following Harmon's preliminary hearing and is not challenged in this appeal.

home alone to take the dog out into the back yard.

Russo and several back-up officers proceeded inside. Harmon, who was friendly and cooperative during the search, assisted the officers by pulling various items of drug paraphernalia and illegal drugs out from underneath a sofa in the living room. She was permitted to telephone her brother—who is a police officer—to seek advice. When the search concluded, Russo permitted Harmon to stay at her home with instructions to phone him the following morning. She was not cited for driving on suspension but was later charged with possession of a controlled substance.

Harmon moved to suppress the evidence obtained during the search of her home. The trial court denied the motion, and she subsequently entered a conditional guilty plea and was placed on probation for eighteen months. The court of appeals affirmed the denial of her motion to suppress, holding that Harmon's stop and arrest were not unconstitutional and that her consent to search her home was freely and voluntarily given. *Harmon,* 854 P.2d at 1039–40.

## II. ANALYSIS

■■■ We first clarify our standard of review. On certiorari, we review the decision of the court of appeals, not the decision of the trial court. *Butterfield v. Okubo,* 831 P.2d 97, 101 n. 2 (Utah 1992); *see also Allen v. Utah Dep't of Health,* 850 P.2d 1267, 1269 n. 4 (Utah 1993). In doing so, this court adopts the same standard of review used by the court of appeals: questions of law are reviewed for correctness, and the trial court's factual findings are reversed only if clearly erroneous. *Landes v. Capital City Bank,* 795 P.2d 1127, 1129 (Utah 1990); *see also State v. Arroyo,* 796 P.2d 684, 687 (Utah 1990). The issues presented in this case— whether Harmon's arrest was constitutional and whether her consent to search was voluntary—are questions of law that we review

for correctness. *See State v. Thurman,* 846 P.2d 1256, 1271–72 (Utah 1993). The trial court's underlying factual findings will not be set aside unless they are found to be clearly erroneous. *Id.*

### A. *Validity of Harmon's Arrest*

■■■ Harmon contends that the court of appeals erred in holding that her arrest for driving on suspension did not violate the Fourth Amendment of the United States Constitution or article I, section 14 of the Utah Constitution.

#### 1. Statutory Authority to Arrest

Initially, we observe the fundamental rule that courts should avoid reaching constitutional issues if the case can be decided on other grounds. *West v. Thomson Newspapers,* 872 P.2d 999, 1004 (Utah 1994); *Thurman,* 846 P.2d at 1262. Thus, we begin by examining whether the arrest was valid under our state statutes. If it was not, then we need not go further.

■■■ When Harmon was arrested in November 1991, Utah's Motor Vehicle Act provided:

> [P]eace officers, state patrolmen, and others duly authorized by the [motor vehicle] department or by law *shall* have the power and it *shall* be their duty:
>
> . . . .
>
> (b) To make arrests upon view and without warrant for any violation committed in their presence of any of the provisions of this act or other law regulating the operation of vehicles or the use of the highways.

Utah Code Ann. § 41–1–17 (1988) (emphasis added).[4] The State argues that the "shall" wording of this statute made it presumptively, if not conclusively, Russo's duty to take Harmon into custody for driving on suspension. This interpretation of the statute is not persuasive. Obviously, it is not police policy and practice to arrest all traffic of-

---

4. This statute has since been completely rewritten and is now found at Utah Code Ann. § 41–1a–107 and § 41–3–105. These current statutes do not mention officers' arrest power for all vehicle-related violations as did section 41–1–17.

*But see* § 41–3–105(8)(a) (1993) (officers "shall" arrest for violations of the Motor Vehicle Act, title 41, chapter 1a, or the Motor Vehicle Business Regulation Act, title 41, chapter 3).

fenders—in fact, almost the exact opposite is true. The statute, originally passed in 1935, used the word "arrest" to mean a seizure or detention, not a formal, custodial arrest. "An arrest is an actual restraint of the person arrested *or* submission to custody." Utah Code Ann. § 77-7-1 (emphasis added). Under this definition, a traffic stop qualifies as an arrest because the alleged violator is not free to leave until he is satisfactorily identified and has signed a written promise to appear, even though the stop is a limited seizure more like an investigative detention than a custodial arrest. *See State v. Parker,* 834 P.2d 592, 594 (Utah Ct.App.1992); *see also* Utah Code Ann. § 41-6-167(d) (referring to "the arresting officer's" issuance of traffic citation to "the arrested person"). Thus, the proper interpretation of section 41-1-17 is that officers have the authority and duty to "arrest"—meaning stop or seize—traffic offenders. The section does not authorize or require officers to take all traffic offenders into custody.[5]

Harmon asserts that police authority to arrest for a misdemeanor traffic violation, including driving on suspension, is limited by the following sections:

### 41-6-166. Appearance upon arrest for misdemeanor—Setting Bond

Whenever any person is arrested *for any violation of this act* punishable as a misdemeanor, the arrested person, for the purpose of setting bond, shall in the following cases, be taken without unnecessary delay before a magistrate within the county in which the offense charged is alleged to have been committed and who has jurisdiction of such offense and is nearest or most accessible with reference to the place where said arrest is made, in any of the following cases:

(1) When a person arrested demands an immediate appearance before a magistrate.

(2) When the person is arrested upon a charge of driving or being in actual physical control of a vehicle while under the influence of alcohol or any drug or combination thereof. . . .

(3) When the person is arrested upon a charge of failure to stop in the event of an accident causing death, personal injuries, or damage to property.

(4) In any other event when the person arrested refuses to give his written promise to appear in court as hereinafter provided, or when in the discretion of the arresting officer, a written promise to appear is insufficient.

### 41-6-167. Notice to appear in court—Contents—Promise to comply—Signing—Release from custody. . . .

(a) *Upon any violation of this act* punishable as a misdemeanor, whenever a person is *[not]* [6] immediately taken before a magistrate as hereinbefore provided, the police officer shall prepare in triplicate or more copies a written notice to appear in court containing the name and address of such person, the number, if any, of his operator's license, the registration number of his vehicle, the offense charged, and the time and place when and where such person shall appear in court.

. . . .

(d) The arrested person, in order to secure release as provided in this section, must give his written promise satisfactory to the arresting officer so to appear in court by signing at least one copy of the written notice prepared by the arresting officer. The officer shall deliver a copy of such notice to the person promising to appear. Thereupon, said officer shall forthwith release the person arrested from custody.

(Emphasis added.)

Harmon contends that under section 41-6-166, persons stopped for misdemeanor traffic

---

**5.** Our use of the word "arrest" throughout the remainder of this opinion refers to a full, custodial arrest.

**6.** The word "not" was included in the original 1941 bill but was accidentally omitted when the bill was enrolled. *See* 1941 Utah Laws 139; 1949 Utah Laws 186. We have previously held that "the only logical reading of the statute is that it has application only when a citation is issued in lieu of an arrest and *no appearance* is made before a magistrate." *Woytko v. Browning,* 659 P.2d 1058, 1061 (Utah 1983) (emphasis added). Thus, the statute should read "whenever a person is *not* immediately taken before a magistrate."

violations are to be arrested and arraigned in only four specific circumstances: (1) when requested by the suspect, (2) when arrested for DUI, (3) when arrested for hit and run, or (4) when the suspect refuses to sign the promise to appear contained in the citation or when, in the discretion of the officer, the written promise to appear is insufficient. She argues that for all other misdemeanor traffic violations, officers have the authority to issue a citation only for a violation under section 41–6–167, after which they must release the suspect.

We decline to address this argument because these sections do not apply to the violation for which Harmon was arrested. By their very terms, both sections apply only when a person is arrested for "any violation of this act." "This act" refers to the Uniform Act Regulating Traffic on Highways, passed by the legislature in 1941. *See* 1941 Utah Laws 113–40. The act in its present form is now codified at title 41, chapter 6. Thus, the reference to "this act" should now properly be read "this chapter," meaning chapter 6. The driving on suspension statute upon which Harmon's arrest was based was not part of the original Uniform Act Regulating Traffic on Highways and is not part of title 41, chapter 6 of the current code. Rather, the statute was initially passed in 1933, *see* 1933 Utah Laws 82, and has been renumbered several times, most recently at section 41–2–136 (Supp.1987) and section 53–3–227 (Supp.1993). If Harmon had been subject to a formal, custodial arrest for a violation under title 41, chapter 6, the interpretation of sections 41–6–166 and –167 would be squarely before us. Because these sections apply only to arrests for violations of title 41, chapter 6 of the Code, and we are not faced with an arrest under that chapter, these sections are not relevant to the issue before us.

■ Utah's general statute governing arrests provides, "A peace officer ... *may*, without warrant, arrest a person ... for any public offense committed or attempted in the presence of any peace officer...." Utah

Code Ann. § 77–7–2 (emphasis added). However, "[a] peace officer, in lieu of taking a person into custody ... *may* issue and deliver a citation requiring any person subject to arrest or prosecution on a misdemeanor or infraction charge to appear at ... court...." Utah Code Ann. § 77–7–18 (emphasis added). Both of these statutes are couched in permissive language allowing police officers, at their discretion, to either cite or arrest for traffic offenses committed in their presence.[7] In this case, Harmon drove on suspension in Detective Russo's presence and in violation of Utah Code Ann. § 41–2–136(2) (Supp.1990) (now codified at § 53–3–227(2)). We conclude that Russo was statutorily authorized to arrest Harmon for driving on suspension.

2. Reasonableness of the Arrest Under the Fourth Amendment

■ Even though the arrest was permissible under statutory authority, Harmon contends her arrest still violated the Fourth Amendment of the federal constitution, which prohibits "unreasonable searches and seizures." The arrest of a person is " 'quintessentially a seizure,' " required by the Fourth Amendment to be reasonable. *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting *United States v. Watson*, 423 U.S. 411, 428, 96 S.Ct. 820, 830, 46 L.Ed.2d 598 (1976) (Powell, J., concurring)).

■ Although the United States Supreme Court has not examined whether a custodial arrest for a traffic offense could be a violation of the Fourth Amendment, the issue did arise in a concurring opinion in *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). In that case, Gustafson was pulled over for weaving across the center line. He could not produce a driver's license, and the officer placed him under arrest. The officer, in searching Gustafson, discovered marijuana. Gustafson conceded that the arrest was lawful, basing his appeal

---

7. *See* Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temple L.Rev. 221, 250 n. 188 (1989) [hereinafter Salken] (listing Utah among twenty-eight states that have no limitations on police discretion to arrest for a traffic offense). Many states have statutes that limit arrests for traffic offenses. *Id.* at 251 n. 189.

only upon the constitutionality of the subsequent search. *Id.* at 262, 94 S.Ct. at 490. Justice Stewart began his concurrence by stating:

> It seems to me that a persuasive claim might be made in this case that the custodial arrest of the petitioner for a minor traffic offense violated his rights under the Fourth and Fourteenth Amendments. But no such claim has been made. Instead, petitioner has fully conceded the constitutional validity of his custodial arrest.

*Id.* at 266–67, 94 S.Ct. at 492 (Stewart, J., concurring); *see also Robbins v. California,* 453 U.S. 420, 450 n. 11, 101 S.Ct. 2841, 2858 n. 11, 69 L.Ed.2d 744 (1981) (Stevens, J., dissenting) (noting that the Court has not imposed constitutional restrictions on authority to arrest for routine traffic stops), *rev'd on other grounds, United States v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); *United States v. Robinson,* 414 U.S. 218, 220–21, 94 S.Ct. 467, 470, 38 L.Ed.2d 427 (1973) (defendant similarly conceded the legality of arrest for driving on suspension and for obtaining a permit by misrepresentation). The issue, at least regarding an arrest for driving on suspension, is now before us.

■ "In defining the scope of Fourth Amendment rights, 'there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." ' " *State v. Lopez,* 873 P.2d 1127, 1133 (Utah 1994) (alterations in original) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Camara v. Municipal Court,* 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967)); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 5.1(h), at 435–36 (1987) [hereinafter 2 LaFave]. In other words, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,*

440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). We apply this balancing test to assess an officer's choice to arrest—rather than merely to detain and cite—a person for driving on suspension. The test permits consideration of a totality of circumstances, recognizing that a multitude of factors may influence an officer's discretion to arrest.

■ Two primary governmental interests are served by taking a suspect into custody: insuring that the suspect will answer the charges against him or her and preventing harm to the public. *See* Utah R.Crim.P. 6(b) (magistrate may issue summons in lieu of arrest warrant if it appears accused will appear and "there is no substantial danger of a breach of the peace, or injury to persons or property, or danger to the community"); Utah Code Ann. § 77-7-2(3)(a), (c) (authorizing arrest where officer has reasonable cause to believe person committed offense and person may "flee or conceal himself to avoid arrest" or "injure another person or damage property belonging to another person"); 2 LaFave at 435 ("Arrest is justified when a person may flee from legal process, or where he may constitute a danger to the public if allowed to remain at large.").[8] Arrest of a suspect can enhance the state's interest in assuring appearance by allowing officers to establish the suspect's identity, investigate the suspect's ties to the community, and require a bond or other condition of release. Arrest of a suspect can also support the state's interest in protecting public safety by removing from the public those who present a danger to others.

Nothing in the record indicates that Detective Russo's arrest of Harmon was motivated by the governmental interest of assuring her appearance at trial to answer the charge of driving on suspension. There was no question as to her identity. Her home was just a few blocks away, and her brother, a deputy sheriff, and her father, recovering from a heart attack, both lived in the area. The State admits that "given her community ties,

---

8. Other governmental interests in arresting suspects may include obtaining evidence of the crime for which the suspect is accused, providing certain social service functions, and maintaining the proper respect for law and the police. *See* Utah Code Ann. § 77-7-2(3)(b); Salken, 62 Temple L.Rev. at 266.

Harmon was relatively unlikely to evade prosecution for driving under suspension." Indeed, the officers' actions best demonstrate that they did not consider her a flight risk: after they discovered drugs in her home—a much more serious offense than driving on suspension—they permitted her to stay at her home, with instructions to phone Russo the following morning.

Those who drive while on suspension, however, do present genuine public safety concerns. License suspension can result from any number of serious driving problems: convictions for automobile homicide, DUI, or reckless driving; mental or physical limitations; or driving or permitting the driving of an uninsured vehicle. *See* Utah Code Ann. §§ 41-2-127, -128 (Supp.1992) (now codified at §§ 53-3-220, -221). The State correctly asserts, "A driver whose license has been suspended should be presumed unfit to drive, owing to the problems that prompted the suspension." When that person continues to drive in deliberate violation of a legally binding order not to drive, the governmental interest in keeping the public safe is compromised. Physically removing the offender from the road helps achieve this interest by preventing the offender, at least for a time, from resuming the dangerous activity and by emphasizing to the offender the seriousness of the offense, thereby discouraging future violations.

These governmental interests must be weighed against the intrusion that the arrest entails.

A custodial arrest is a serious intrusion on a person's freedom and privacy. In a society in which freedom and independence are valued, arrest is the gravest of indignities. One arrested is not only no longer free to walk away, but also is suddenly in the control of another human being. If he resists, force will be used. A person arrested can no longer choose when he eats, with whom he associates, where or whether he will sit or stand, or even when he may go [to] the bathroom.

Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses,* 62 Temple L.Rev. 221, 263-64 (1989). In addition, any full custodial arrest, even for a misdemeanor traffic violation, allows an officer to conduct a highly intrusive search of the arrested person, *Robinson,* 414 U.S. at 235, 94 S.Ct. at 477, and his or her vehicle, *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

We recognize that a number of factors weigh in favor of Harmon's argument that her arrest was unreasonable. First, she was arrested only blocks from her home to which she could have walked, arguably without any danger of future harm to the public. Second, driving on suspension is a class C misdemeanor, comparable to most other traffic offenses. *See* Utah Code Ann. § 41-6-12(1) (violations of traffic rules and regulations are class C misdemeanors unless otherwise provided). Finally, the officers apparently have few, if any, limits on their discretion to arrest since there are no statutory (*see* section II. A.1. above) or administrative (we find none in the record) guidelines governing that decision. *But see State v. Parker,* 834 P.2d 592, 595-96 (Utah Ct.App.1992) (holding that officer abused his statutory discretion in arresting, at gunpoint, person who exceeded the speed limit by about twenty miles per hour).[9]

These factors notwithstanding, we conclude that Harmon's arrest for driving on suspension was not unreasonable in light of the governmental interest in removing unlicensed drivers from the road for public safety reasons. Other jurisdictions have uniformly held that driving on suspension is sufficiently serious to justify the offender's arrest rather than mere detention and citation. *See, e.g., State v. S.P.,* 580 So.2d 216, 217 (Fla.Dist.Ct.App.), *review denied,* 592 So.2d 682 (1991); *People v. Anderson,* 169 Ill.App.3d 289, 120 Ill.Dec. 123, 129, 523 N.E.2d 1034, 1040, *appeal denied,* 122 Ill.2d 579, 125 Ill.Dec. 223, 530 N.E.2d 251 (1988),

---

9. *See also* Joanne R. Whiting, *When Probable Cause is Constitutionally Suspect,* 1991 Wis. L.Rev. 345, 369-72; Arthur Mendelson, *Arrest for Minor Traffic Offenses,* 19 Crim.L.Bull. 501, 510-

12 (1983) (both encouraging statutory and administrative guidance to limit officer discretion to arrest for traffic violations).

*cert. denied,* 490 U.S. 1036, 109 S.Ct. 1935, 104 L.Ed.2d 407 (1989); *State v. Pierce,* 136 N.J. 184, 642 A.2d 947, 958 (1994) (upholding arrest in part because driving on suspension "poses grave danger to the public"); *State v. Hollis,* 161 Vt. 87, 633 A.2d 1362, 1364 (1993); *State v. Reding,* 119 Wash.2d 685, 835 P.2d 1019, 1023 (1992) (overruling prior contrary authority).[10] Harmon has not identified, and we have not found, a single case where an arrest for driving on suspension has been held to be unconstitutional.

This holding should be construed narrowly and does not necessarily apply to other traffic violations. "It should be the policy of every law enforcement agency to issue citations in lieu of arrest or continued custody to the maximum extent consistent with the effective enforcement of the law." 2 LaFave at 432 (citing A.B.A. Standards Relating to Pretrial Release § 2.1 (Approved Draft, 1968)); *see also Parker,* 834 P.2d at 595 ("[I]t is difficult to imagine any circumstances surrounding a routine traffic stop in which [an arrest] would be justified."). As we stated in *Lopez:*

> [A]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, conduct a computer check, and issue a citation. However, *once the driver has produced a valid driver's license and evidence of entitlement to use the vehicle,* "he must be allowed to proceed on his way, without being subjected to further delay by police for additional questioning."

*Lopez,* 873 P.2d at 1132 (emphasis added) (quoting *State v. Robinson,* 797 P.2d 431, 435 (Utah Ct.App.1990)); *see also United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir. 1988). In this case, Harmon could not produce a valid driver's license or evidence of entitlement to use her vehicle. Her offense of driving on suspension is different from, for example, speeding, because allowing her to "proceed on her way" without a valid license permits the continuation of her unlawful activity. We conclude that her arrest was reasonable.

**3. Pretext Arrest Doctrine**

 Harmon argues that we should apply the "pretext doctrine" to her traffic arrest. The pretext doctrine focuses on whether a hypothetical reasonable officer, in view of the totality of the circumstances, *would* have undertaken the challenged Fourth Amendment activity. *Lopez,* 873 P.2d at 1134. In *Lopez,* we rejected the doctrine as applied to temporary stops for traffic violations. We concluded that settled "cause-to-stop" and "scope-of-detention" rules adequately protect citizens from improper police stops for traffic violations. *Id.* at 1135–36. We also explained that the doctrine erroneously focuses on the subjective, "unconstitutional motivation" of the detaining officer and discourages equal protection of the law. *Id.* at 1136–40. We are now presented with the issue of whether a pretext analysis may still be applied to invalidate an *arrest* when it appears the arresting officer hoped to discover evidence of criminal activity other than that for which the arrest was made.

In *State v. Archuleta,* this court addressed a pretext arrest argument. 850 P.2d 1232 (Utah), *cert. denied,* —— U.S. ——, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993). There, a man arrested for violating his parole was also, at the time of his arrest, a murder suspect. *Id.* at 1237. In seeking to have his incriminating statements about the murder suppressed, he asserted that he was arrested for the sole purpose of gathering evidence against him on the murder charge rather than for the parole violation. We stated, "An arrest may not be used solely as a pretext to search for evidence of another crime." *Id.* at 1237–38 (citing *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932)). Although we suggested that an arrest could be unconstitutionally "pretextual," we upheld the arrest for the parole violation. We held:

---

10. We note that in several Utah cases, arrests for driving on suspension were not challenged. *See In re One Hundred Two Thousand Dollars,* 823 P.2d 468, 469 (Utah 1992); *State v. Rice,* 717 P.2d 695, 696 (Utah 1986); *State v. Pacheco,* 712 P.2d 192, 193 (Utah 1985), *cert. denied,* 479 U.S. 813, 107 S.Ct. 64, 93 L.Ed.2d 22 (1986); *State v. Jackson,* 805 P.2d 765, 769 (Utah Ct.App.1990), *cert. denied,* 815 P.2d 241 (1991); *State v. Baird,* 763 P.2d 1214, 1216 (Utah Ct.App.1988).

[I]f police have a valid right to arrest an individual for one crime, it does not matter if their subjective intent is in reality to collect information concerning another crime.... In other words, if the alleged pretext arrest could have taken place absent police suspicion of the defendant's involvement in another crime, then the arrest is lawful.... The arrest was not rendered invalid solely because the officers had a separate motive for arresting him....

*Id.* at 1238 (citing, among others, 1 Wayne R. LaFave, *Search and Seizure* § 1.4(e) (1987) [hereinafter 1 LaFave]).

Unfortunately, the pretext issue was not squarely before the court in *Archuleta* because the officers had attempted to arrest the parolee for the parole violation even before they suspected him of involvement in the murder. *Id.* In other words, they "would" have arrested him even if he had not been a murder suspect. Nevertheless, the opinion indicates that where officers were justified in arresting a defendant for crime A—even if the defendant would not have been arrested but for his or her suspected involvement in crime B—the arrest for crime A would still be valid.

In *State v. Pena,* 869 P.2d 932 (Utah 1994), we considered another pretext arrest argument. In that case, officers pulled over a car whose occupants were suspected in a recent theft. *Id.* at 934. The passenger in the car was arrested for giving false personal information to an officer. At the jail, officers conducted a search of the defendant and discovered cocaine. *Id.* The defendant contended that his arrest for giving false information was a pretext for the search. *Id.* at 941. We stated: "This contention is based on the assumption that the arrest was improper. Because we find that the officers had probable cause to arrest Pena [for giving false information], we do not consider his pretext argument." *Id.* (citing *Archuleta,* 850 P.2d at 1237–38). As in *Archuleta,* we held that where officers were authorized to arrest a defendant for one crime, it did not matter that their subjective intent may have been to collect information concerning another crime. In fact, the court in *Pena* refused to examine any consideration other than whether the arrest for the stated crime was proper.

This is the position taken by the United States Supreme Court. In *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168, *reh'g denied,* 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978), federal agents wiretapped a telephone which they believed was being used by drug dealers. The agents made no attempt to comply with a portion of the wiretap statute requiring that such activities be conducted so as to minimize their interceptions of nondrug-related conversations. The Court found that the agents' actions were reasonable under the circumstances and rejected a proposed examination of the agents' motives:

[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.

*Id.* at 138, 98 S.Ct. at 1723 (citing *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)); *see also United States v. Villamonte–Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983) (refusing to examine customs officers' motives when they were authorized to board ship); 1 LaFave § 1.4(a), at 83 (supporting the above wording in *Scott* as "precisely what the rule ought to be").

Other courts have similarly held that the officers' objective authority to arrest, not their subjective motive, is the relevant inquiry. In *People v. Holloway,* 416 Mich. 288, 330 N.W.2d 405, 406 (1982), *cert. denied,* 461 U.S. 917, 103 S.Ct. 1900, 77 L.Ed.2d 288 (1983), a case with facts somewhat similar to those in this case, police officers arrested a suspected drug dealer for driving on suspension. The defendant asserted that his arrest was really a pretext to search his car. *Id.* at 407. The Michigan Supreme Court held:

The fact that the police officers effectuated the arrest also realizing that they might find narcotics or other evidence of illegal activity is entirely irrelevant, unless police officers primarily concerned with enforcing

certain laws are prohibited from enforcing other laws as well. We are aware of no such constitutional proscription.

*Id.; see also State v. Pickett,* 126 Ariz. 173, 613 P.2d 837, 838 (Ct.App.1980) (officer properly arrested person suspected of other crimes for drinking alcohol in public); *Traylor v. State,* 458 A.2d 1170, 1174 (Del.1983) (officer properly arrested suspected drug dealer for driving on suspension); *People v. Anderson,* 169 Ill.App.3d 289, 120 Ill.Dec. 123, 129, 523 N.E.2d 1034, 1040 (1988) (officer properly arrested murder suspect for driving on suspension).

In attempting to apply the pretext doctrine, Harmon argues that her arrest was unconstitutional because even if she "could" have been arrested for driving on suspension, a reasonable officer in Detective Russo's position "would" not have done so. After considering our opinions in *Lopez, Archuleta,* and *Pena,* as well as cases from other jurisdictions, we conclude that the "pretext arrest" analysis should be rejected for many of the same reasons that we rejected the "pretext stop" analysis. The validity of an arrest must be analyzed on objective criteria, not on an officer's subjective motivations or suspicions. Inquiring into "what a reasonable officer would do" focuses on a question that is falsely objective, "fails to provide the consistency and predictability officers need," and ignores the possibility that usual police practice may be unconstitutional. *Lopez,* 873 P.2d at 1138. Rather than debating the label or propriety of Detective Russo's motivations, we need only look at whether his arrest of Harmon for driving on suspension was reasonable under the balancing test in the previous section. If it was reasonable, it was constitutional.

**4. Reasonableness of the Arrest Under Article I, Section 14**

 Harmon argues that even if the arrest was reasonable under the Fourth Amendment of the federal constitution, the arrest was unreasonable under article I, section 14 of the Utah Constitution. We disagree. The federally based balancing analysis, although admittedly imprecise, is straightforward, unburdened of unworkable

"pretext" inquiries, and fundamentally sound. In *Lopez,* 873 P.2d at 1140, we concluded that "because the pretext doctrine is unsound, we refuse to adopt it under article I, section 14 ... of the Utah Constitution." This holding also applies to pretext arrests.

**B. Consent to Search**

 Harmon contends that the court of appeals erred in holding that her consent to search her home given to Detective Russo following her arrest was voluntary and not the fruit of an illegal arrest. Because we have concluded that Harmon's arrest for driving on suspension was valid, we need only examine whether her consent was voluntary. *See Thurman,* 846 P.2d at 1262.

 Whether a consent is voluntary depends upon "'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of' police conduct." *Id.* at 1262–63 (quoting *Arroyo,* 796 P.2d at 689); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A "consent" that is the product of duress and coercion is not a consent at all. *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389, 401 (1991). Factors indicating a lack of duress or coercion include

> 1) the absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the owner of the vehicle; and 5) the absence of deception or trick on the part of the officer.

*State v. Whittenback,* 621 P.2d 103, 106 (Utah 1980); *see also State v. Delaney,* 869 P.2d 4, 8 (Utah Ct.App.1994).

In this case, the first and fifth factors are closely related so we will examine them together. Harmon asserts that Detective Russo made a false claim of authority to search, involving deception and trickery, by implying that he could get a warrant if she withheld her consent. At their initial confrontation, Russo advised Harmon that if she refused to consent to a search of her home, he "could come back at a later time with a [search] warrant," the execution of which he warned

was an "unpleasant experience." Later, on the way to jail, Russo allegedly told her "he would have to" get a warrant. At the suppression hearing, Russo admitted that he knew he did not have sufficient evidence to obtain a warrant.[11] Yet Harmon testified, "He acted like he could run two blocks away and get it. That was my impression."

Clearly a statement by police that they have a valid search warrant in hand, when in fact they do not, is coercive. *See Bumper v. North Carolina*, 391 U.S. 543, 549–50, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Less clear, however, is the validity of a police threat to obtain a warrant if consent is withheld. According to the leading scholar of search and seizure issues, "[t]he only noticeable difference between a false claim that a warrant *has been* obtained and a false claim that a warrant *will* be obtained is that the latter is less immediate...." 3 Wayne R. LaFave, *Search and Seizure* § 8.2(c), at 187 (1987) [hereinafter 3 LaFave]; *see also United States v. Faruolo*, 506 F.2d 490, 495–98 (2d Cir.1974) (Newman, J., concurring). The claim is especially offensive when there is a clear lack of information to obtain a warrant. *See State v. Bobo*, 803 P.2d 1268, 1274 n. 7 (Utah Ct.App.1990) ("[A]ny indication by officers that issuance of a warrant was inevitable would vitiate an ensuing consent if probable cause was anything less than iron-clad.").

Russo's statement that "I could" come back with a warrant, while not as misleading as "I will" come back with a warrant, is still troubling. It implies full confidence that a warrant will issue. Even worse, the statement may cause a layperson to believe that the warrant will *automatically* issue, without any exercise of judicial power. Even though the trial court found that he "made no representations that he would most likely be granted a warrant," we conclude that

Russo's representation that he "could come back" with a warrant, when in fact he knew he could *not* come back with a warrant absent more evidence, was deceptive. *See Dotson v. Somers*, 175 Conn. 614, 402 A.2d 790, 794 (1978) (police represented that they "could" get a warrant); *State v. Mitchell*, 360 So.2d 189, 191 (La.1978) (police represented that they could get a warrant "in twenty minutes").[12]

While Russo's statement is one factor indicating coercion, it does not, by itself, render Harmon's later consent involuntary. Importantly, Harmon refused her consent to the search following Russo's statement. She simply drove away. Russo's second alleged statement—that "he would have to" get a warrant as a result of Harmon's refusal to allow the search—was accurate and not coercive. It is also significant that the trial court credited Russo's testimony that he "informed Harmon multiple times that he was not authorized to search her house without her consent" because he did not have a search warrant. The record confirms that Harmon always knew that Russo did not have a warrant and could not search absent her consent.

Harmon asserts that there was a clear exhibition of force when four officers participated in arresting and searching her, confiscating her money, and searching and impounding her car. A consent given while one is in custody does not, per se, render the consent involuntary, but it is an important consideration. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *Thurman*, 846 P.2d at 1273. "'The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent.'" 3 LaFave § 8.2(b), at 182 (quoting *United*

---

11. At the suppression hearing, Harmon's counsel asked Russo, "[B]ased on the information you had, you couldn't have gotten a search warrant, could you?" Counsel for the State objected to the question because the answer "calls for the officer to make a legal conclusion." The court initially sustained the objection but later permitted the question after Harmon's counsel clarified that Russo had applied for about forty search warrants before this incident and was basing his testimony only upon his own experience. Russo

admitted that he did not have enough information to obtain a warrant to search Harmon's home.

12. The court of appeals has wisely stated, "[O]fficers would be well advised to refrain from any commentary, direct or by implication, on the likelihood a warrant would actually issue." *State v. Bobo*, 803 P.2d 1268, 1274 n. 7 (Utah Ct.App.1990).

*States v. Jones,* 475 F.2d 723, 730 (5th Cir. 1973)).

In assessing this question, we examine the characteristics of this arrest. *Id.* at 183. The arrest did not occur late at night, was not made at gunpoint, was not made by a forcible entry, and did not involve the use of force against Harmon. However, Harmon argues that Russo used the arrest as leverage to obtain consent to search, i.e., he would not take her to jail if she gave her consent. If true, this fact certainly would be a significant aggravating factor demonstrating lack of voluntary consent. *See id.* at 183 n. 48. However, the trial court specifically found that "Detective Russo did not promise Harmon any benefit for permitting a search of her house and stated that Harmon would probably go to jail" even if she consented to the search. Harmon does not mount an argument against that credibility assessment. We conclude that it is supported by the record and is not clearly erroneous.

Although Harmon was placed in handcuffs upon her arrest, this apparently did not have any real impact upon her decision to consent since, at that time, she clearly refused to allow the search. Only later, after any "show of force" had dissipated, did Harmon agree to the search. Other cases involving far more extreme demonstrations or threats of force have resulted in holdings that consents or confessions were voluntarily given. *See Thurman,* 846 P.2d at 1272–73; *State v. Bishop,* 753 P.2d 439, 464 (Utah 1988); *State v. Hegelman,* 717 P.2d 1348, 1350 (Utah 1986).

Harmon alleges that Russo made repeated "demands" to search her home. The record does not support this assertion. At their first confrontation, Harmon refused Russo's request to search and drove away. Harmon testified that after her arrest some time later, Russo again asked to search—an assertion that he denied.[13] Even assuming that Harmon's testimony is true, both parties agree that she again refused to allow a search at that time. Only later in Russo's car, and not in response to any request, did Harmon state that she would allow a search.

Harmon further asserts that her concern for her father's health made her more susceptible to consent because she did not want to cause him additional stress. Although her father was apparently recovering from a heart attack, he was no longer in the hospital and apparently somewhat active. When Harmon went to visit her father after refusing Russo's initial request to search, she discovered that he had gone elk hunting with a friend. Regardless of his condition, the trial court correctly reasoned that "it is not unusual for someone to be apprehensive that family members will be upset to learn of that person's arrest and pending criminal charges." We are not persuaded that Harmon's apprehension about her father prevented her from voluntarily consenting to the search.

Other facts demonstrate that her consent was voluntary. The record indicates that Harmon, once past the indignation of her arrest, was friendly and cooperative. She twice offered her consent after being advised of her *Miranda* rights. Upon arriving at her home, Russo repeated the *Miranda* warnings and read to Harmon a written search consent form, which she then signed. "[I]t is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' " *Bishop,* 753 P.2d at 464 n. 76 (quoting *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976)). Having examined the record here, we conclude that Harmon's consent to search her home was voluntary.

We affirm the court of appeals' decision upholding Harmon's conviction.

ZIMMERMAN, C.J., and RUSSON, J., concur in Justice HOWE's opinion.

DURHAM, Justice, dissenting:

I respectfully dissent. The majority holds that "Harmon's arrest for driving on suspension was not unreasonable in light of the governmental interest of removing unlicensed drivers from the road for public safety reasons," while simultaneously concluding that "[n]othing in the record indicates that

---

13. The trial court did not make any factual finding regarding this testimony.

Russo's arrest of Harmon was motivated by the governmental interest of assuring her appearance at trial." Part of the rationale for the second conclusion—that Harmon was eventually left at her home and not incarcerated—is, it seems to me, equally applicable to the first. In other words, there is nothing in the record to suggest that Harmon's arrest was motivated by the governmental interest in getting her off the road for public safety reasons. She was only a few blocks from her home; her car was parked off the roadway, and she was not driving it or threatening to drive it when arrested. This arrest appears to have been motivated solely by the desire of the arresting officer to intimidate Harmon into consenting to a search of her home and, more significantly, to have been unreasonable under these circumstances.

STEWART, Associate C.J., concurs in Justice DURHAM's dissenting opinion.