**C. P., Plaintiff and Appellant,**

v.

**UTAH OFFICE OF CRIME VICTIMS' REPARATIONS, Defendant and Appellee.**

**No. 971763–CA.**

Court of Appeals of Utah.

Oct. 16, 1998.

Third District, Salt Lake Department. The Honorable Tyrone E. Medley.

Robert G. Wing, Prince Yeates & Geldzahler, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., and James H. Beadles, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before DAVIS, P.J., and BENCH and BILLINGS, JJ.

## OPINION

BILLINGS, Judge.

C.P. appeals the denial of her request for crime victim reparation funds to pay for her sexually abused daughter's mental health counseling. We reverse and remand.

## FACTS

C.P.'s daughter was sexually abused by her uncle. C.P. applied for reparation funds from the Utah Office of Crime Victims' Reparations (Crime Victims') in 1989. Crime Victims' granted C.P.'s daughter an award for mental health counseling on June 23, 1989. On June 29, 1991, C.P.'s daughter was admitted into a Benchmark Hospital (Benchmark) counseling program, a non-Medicaid provider. Crime Victims' learned of the admission on July 1, 1991, and notified Benchmark that because the daughter was eligible for Medicaid through July 31, 1991, Crime Victims' would not reimburse the clinic for her treatment. On September 10, 1991, Crime Victims' first notified C.P. that it would not cover any charges stemming from her daughter's stay at Benchmark because she was eligible for Medicaid at the time. In 1993, a Crime Victims' reparations officer denied payment for the daughter's stay at Benchmark because potential Medicaid coverage was considered as an available collateral source under the Crime Victims' Act.

C.P. appealed the reparations officer's decision. An administrative hearing officer affirmed the reparations officer's decision to deny payment. C.P. appealed the hearing officer's determination to the Crime Victims' Board (the Board). The Board denied C.P.'s appeal on October 11, 1994, stating that Crime Victims' unwritten "statements of policy were binding upon the director, the reparations officers and other staff," and thus C.P.'s claims were properly reduced to exclude counseling received when her daughter was eligible for Medicaid.

On November 8, 1994, C.P. filed a Complaint and Petition for Review of Informal Adjudicative Proceedings in Third District Court. The court dismissed her complaint without prejudice on December 1, 1995, for failure to properly serve the complaint and petition. C.P. refiled her complaint on December 11, 1995. Crime Victims' filed a Motion to Dismiss C.P.'s December 11 complaint, alleging the statute of limitations had run and therefore the district court lacked jurisdiction to hear the case. The trial court ruled that C.P.'s complaint had been "saved" by Utah Code Ann. § 78–12–40 (1996), and thus C.P. timely filed the complaint under the Utah Administrative Procedures Act (UAPA). However, the trial court also held that Crime Victims' properly denied C.P.'s claim. C.P. appeals.

## ANALYSIS

Three issues are presented on appeal. As a threshold matter, Crime Victims' argues that the Utah "savings statute," Utah Code Ann. § 78–12–40 (1996), does not apply to C.P.'s claim and, because she filed her December 11, 1995, complaint after the thirty-day jurisdictional time limit set forth in UAPA section 63–46b–14(3)(a) (1997), we lack jurisdiction to hear her appeal.[1] C.P. raises two issues: First, she argues the

1. Crime Victims' also claims we should not reach the merits of this case because C.P. used the wrong case number on her appeal, citing to the action that was dismissed for lack of service. This error originated when the trial judge entered the wrong case number on his order. Subsequent briefs have corrected the error and this court has received the proper record and has reviewed it. We conclude this technical deficiency has been cured and does not bar us from

reaching the merits. Further, Crime Victims' points out that C.P. does not cite to the record in her briefs, and thus concludes that we should "assume the correctness and regularity of the judgment and affirm without reaching the merits." Crime Victims' second contention also fails because C.P.'s appeal deals solely with questions of law, and the parties stipulated to the facts before the trial court.

Crime Victims' Act does not identify potential Medicaid benefits as an available collateral source, and thus she should be able to recover for her daughter's counseling. Second, she argues that the Board's Medicaid policy does not bar her recovery because it was never adopted through the procedures required by the Utah Administrative Rulemaking Act.

## I. The Utah "Savings Statute" Applies to Judicial Review of Final Agency Action

■ We review the trial court's legal determination that the Utah "savings statute" applies to UAPA's judicial review provision under a correctness standard, and thus accord it no deference. *See Standard Fed. Sav. & Loan v. Kirkbride,* 821 P.2d 1136, 1137 (Utah 1991).

UAPA's judicial review provision states in pertinent part: "A party shall file a petition for judicial review of final agency action within 30 days after the date that the order constituting the final agency action is issued or is considered to have been issued under Subsection 63–46b–13(3)(b)." Utah Code Ann. § 63–46b–14(3)(a) (1997). "The petition for judicial review of informal adjudicative proceedings shall be a complaint governed by the Utah Rules of Civil Procedure." *Id.* § 63–46b–15(2)(a).

On October 11, 1994, the Board denied C.P.'s appeal of Crime Victims' refusal to pay for her daughter's treatment. C.P. filed her first complaint and petition for Judicial Review of Informal Adjudicative Proceedings on November 8, 1994—before the thirty-day UAPA deadline had expired. The trial court dismissed her complaint without prejudice on December 1, 1995, for failure to properly serve the complaint and petition. C.P. refiled on December 11, 1995, after the thirty-day judicial review filing deadline had passed.

The Utah "savings statute" states:
If any action is commenced within due time and a judgment thereon for the plaintiff is reversed, or if the plaintiff fails in such action or upon a cause of action otherwise than upon the merits, and the time limited either by law or contract for com-

mencing the same shall have expired, the plaintiff ... may commence a new action within one year after the reversal or failure.

Utah Code Ann. § 78–12–40 (1996). Thus C.P.'s action is timely if the "savings statute" applies to her claim.

This is not the first time Utah courts have interpreted the scope of the "savings statute." In *Kirkbride,* 821 P.2d at 1138, the appellants argued that Standard's deficiency judgment action should be dismissed because Standard's original action was dismissed for failure to properly serve, and its second filing had exceeded the 120–day statutory filing deadline for deficiency judgments. Our supreme court held that the "savings statute" applied to save this statutory action:

[Appellants] reason that section 78–12–40 is a general renewal statute and, as such, it may appropriately be applied in a case asserting a common law action or a cause of action created by a statute lacking a specific limitation period. However, they assert that where a statute creates a cause of action and contains a specific limitation period for that cause of action, it should be inferred that the legislature intended to bar the application of a general renewal statute.

We find this argument unpersuasive. The relevant inquiry is whether the legislature made plain an intention to bar forever claims of those who are guilty of a procedural misstep....

A more sensible view of the operation of the three-month limitation period contained in section 57–1–32 *is that its primary purpose is satisfied when the foreclosing party provides notice to the debtor that a deficiency will be sought by filing the action.*

*Id.* (citations omitted) (emphasis added). In sum, the supreme court generalized that "[i]n the absence of ... a plain expression of intent, we have generally read statutes that impose preconditions to filing suit as establishing *only procedural hurdles to suit, hurdles that can be cleared, rather than absolute*

*bars to suit." Id.* (emphasis added).[2] Thus the court applied the "savings statute" to a statutorily created claim with its own statute of limitations.

In this case, section 63–46b–14(3)(a) sets a thirty-day deadline for "[a] party to file a petition for judicial review of final agency action." We find nothing in UAPA section 63–46b–14(3)(a) that definitively barred C.P. from refiling her petition within the extended one year period provided by the "savings statute." When C.P. filed her initial petition, Crime Victims' was placed on notice that she intended to pursue her claim and thus "received all the benefit the [thirty-day] limit conferred on them." *Kirkbride,* 821 P.2d at 1139. We conclude the trial court correctly ruled that Utah's "savings statute" applies to section 63–46b–14(3)(a)'s thirty-day judicial review filing deadline. Thus C.P.'s second petition was timely filed and properly before the trial court.

## II. The Crime Victims' Act

The trial court concluded that the language of the Crime Victims' Act (the Act) allowed Crime Victims' to withhold reparations. On appeal, C.P. argues that the plain language of the Act does not allow Crime Victims' to withhold payment for her daughter's counseling by treating her potential eligibility for Medicaid as a collateral source. We agree.

"This is a question of statutory construction, a question of law reviewed by this court under a 'correction of error' standard." *Brown & Root Indus. v. Industrial Comm'n,* 947 P.2d 671, 675 (Utah 1997) (citing *State v. Harmon,* 910 P.2d 1196, 1199 (Utah 1995) (additional citation omitted)).

The Act defines a "collateral source" as "a source of benefits or advantages for economic loss otherwise reparable under this chapter which the victim or claimant *has received or which is readily available to him, from . . .*

*Medicaid."* Utah Code Ann. § 63–63–2(4)(c) (Supp.1988) (emphasis added).[3] However, the Act's operational provisions state:

> (5) (a) Reparations otherwise payable to a claimant *shall be reduced or denied to the extent:*
>
> > (i) *The economic loss upon which the claim is based has been recouped from other persons, including collateral sources . . .*
> >
> > . . . .
>
> (c) *An applicant may not be denied reparation solely because he is entitled to income from a collateral source;* the reparations officer may make an award and withhold payment pending verification of collateral sources. *The award may then be reduced by the amount of available collateral source income.*

*Id.* § 63–63–5(a) & (c) (Supp.1988) (emphasis added).

The Act's plain language states that a victim shall not be denied reparations because of potential income but only when that income "has been recouped from other persons, including collateral sources." Thus the potential availability of Medicaid coverage does not bar C.P.'s claim. We therefore conclude C.P. is not barred from recovery by the Act's language.

## III. Crime Victims' Unwritten Medicaid Policy

The trial court alternatively ruled that the Board's unwritten policy barred C.P.'s claim. The Board's unwritten policy provided that if a claimant could have received services from a Medicaid provider, the claim for services from a non-Medicaid provider would be barred because the potential Medicaid coverage is an available collateral source. C.P. argues that this policy does not preclude her recovery because it was not

---

**2.** The *Kirkbride* court also provided an example of when the Legislature had provided a statute with a definite and finite time period for filing that would preclude application of the general "savings statute": "[S]ection 63–30–13 of the Governmental Immunity Act provides: 'A claim against a political subdivision . . . is *barred* unless notice of claim is filed . . . within one year after

the claim arises. . . .' Utah Code Ann. § 63–30–13 (1989) (emphasis added)." *Kirkbride,* 821 P.2d at 1138. (citations omitted).

**3.** This chapter has been recodified at Utah Code Ann. §§ 63–25a–401 to 428 (Supp.1998 & 1997).

properly adopted through the Utah Administrative Rulemaking Act.

■ Whether Crime Victims' can bar reparation claims based on an informal policy not adopted pursuant to the Utah Administrative Rulemaking Act is a question of law. We therefore review the trial court's ruling for correctness. *See Williams v. Public Serv. Comm'n*, 720 P.2d 773, 775–78 (Utah 1986); *Ellis v. State Retirement Bd.*, 757 P.2d 882, 886–88 (Utah Ct.App.1988).

Sections 63–63–6(1)(b)(c) and (2) of the Crime Victims' stated that

(1) The Board shall:

. . . .

(b) prescribe policy for the Reparations office;

(c) *adopt rules according to the Utah Administrative Rulemaking Act to implement this chapter and board policies,* and establish procedure and practice requirements of the board and staff, which rules may include but are not limited to, setting of ceilings on reparations, defining of terms not specifically stated in this chapter . . .

. . . .

(2) All rules, or other statements of policy, along with application forms specified by the board, are binding upon the director, the reparations officers, and other staff.

Utah Code Ann. §§ 63–63–6(1)(b)(c) & (2) (1986) (emphasis added).

The Utah Administrative Rulemaking Act defines "policy" as "a statement applying to persons or agencies that: (i) broadly prescribes a *future course of action, guidelines, principles or procedures;* or (ii) prescribes the internal management of an agency." Utah Code Ann. § 63–46a–2(10)(a) (Supp. 1997) (emphasis added). Further, section 63–46a–3 outlines when rulemaking is and is not required:

(2) In addition to other rulemaking required by law, each agency shall make rules when agency action:

(a) *authorizes, requires, or prohibits an action;*

. . . .

(c) applies to a class of persons or another agency;

. . . .

(4) *Rulemaking is not required when:*

(a) *agency action applies only to internal agency management* . . .

. . . .

(c) *an agency issues policy or other statements that are advisory, informative, or descriptive, and do not conform to the requirements of Subsections (2) and(3)* . . .

*Id.* § 63–46a–3. (Emphasis added.)

The plain language of the Act and the Administrative Rulemaking Act require that the Board "adopt rules according to the Utah Administrative Rulemaking Act to implement ... board policies." *Id.* § 63–63–6(1)(c) (1997). Furthermore, the Administrative Rulemaking Act requires that an agency follow the procedures for rulemaking whenever an agency action "authorizes, requires or prohibits an action." *Id.* § 63–46a–3(2)(a). Certainly, requiring Medicaid applicants to use a Medicaid provider before using other sources is a broad policy. Thus, the plain language of these Acts requires Crime Victims' to implement its Medicaid policy through the procedures provided in the Administrative Rulemaking Act.[4]

Our reading is consistent with prior case law considering when it is essential for agencies to follow formal rulemaking procedures. In *Williams v. Public Serv. Comm'n*, 720 P.2d 773, 775 (Utah 1986), our supreme court looked at three factors in determining that the Public Service Commission had violated the Utah Rulemaking Act by failing to promulgate a rule pursuant to the Rulemaking Act's requirements.[5]

---

4.  Crime Victims' argues that section 63–63–6(2) of the Act provides that policies are binding on the director and the staff. However, reading the statute as a whole, under section 63–63–6(1) it is clear policies are binding only when adopted under the Administrative Rulemaking Act.

5.  In *Williams,* the court interpreted the predecessor to the current Utah Administrative Rulemaking Act. However, "the court stated that its conclusion would not be any different had the court been called upon to interpret the definition of 'rule' within the meaning of the subsequently enacted Administrative Rulemaking Act." *Ellis v.*

First, the Commission's decision was generally applicable ... Second, the [Commission's] letter interpreted the scope of the Commission's statutory regulatory powers, thus "interpret[ing] the law" within the meaning of the Rule Making Act. Moreover [and finally], in so acting the Commission, in the words of Professor Davis, made a "change in clear law."

*Id.* at 776. The court concluded that the Commission's decision not to require a "certificate of public convenience and necessity" for the operation of a one-way mobile paging service was invalid because it failed to follow the Rulemaking Act's requirements. *See id.* at 777.

Applying the three-part *Williams* test here, we conclude that the Board impermissibly promulgated a "rule" without following the requirements of the Administrative Rulemaking Act. First, the Board's Medicaid policy was "generally applicable" to any and all persons seeking reparation funds. Second, the Board's policy plainly "interpreted the scope of the [Board's] statutory regulatory power, thus 'interpreting the law,' within the meaning of the [Administrative Rulemaking Act]." *Id.* at 776. Finally, though it is uncertain as to what extent the Board's policy resulted in a "change in clear law," prior to the Medicaid policy being promulgated, a Medicaid-eligible victim could apparently seek treatment through any facility and expect to receive reparation funds.

We thus conclude the Board's Medicaid policy impermissibly circumvented the Administrative Rulemaking Act's requirements and cannot be used to bar C.P. from recovering reparations.[6]

## CONCLUSION

In sum, we conclude that this court has jurisdiction over C.P.'s claim because the Utah "savings statute" applies to claims arising under UAPA. Further, we conclude that the Crime Victims' Act and regulations did not permit the Crime Victims' Board to deny payment of C.P.'s daughter's counseling fees. Finally, because the Crime Victims' Board's unwritten Medicaid policy was not properly adopted through the Utah Administrative Rulemaking Act, the policy does not bar C.P.'s claim. We therefore reverse and remand for the entry of the appropriate award of reparations to C.P.[7]

DAVIS, P.J., and BENCH, J., concur.

*Utah State Retirement Bd.,* 757 P.2d 882, 887 n. 6 (Utah Ct.App.1988) (citing *Williams,* 720 P.2d at 775 n. 7).

**6.** The Crime Victims' Reparations Act has been recently recodified in Utah Code Ann. §§ 63–25a–401 to –428 (1997). Though the explanation of collateral sources has moved to section 63–25a–413, its definition remains unchanged from the 1988 version of the Crime Victims' Act. In 1990, the Crime Victims' Board properly promulgated a rule under the Utah Administrative Rulemaking Act that further defined a collateral source. This rule reads in pertinent part: "If the victim qualifies for Medicaid, the contract monies should be used first." Utah Admin. Code R270–1–12(C) (Supp.1997). However, both parties agree that the 1988 version of the Act and the rules adopted pursuant thereunder govern this 1989 claim.

**7.** Furthermore, we note that at oral argument counsel for Crime Victims' conceded that availability of funds was not the reason for denying C.P.'s claim.